**In the Disciplinary Matter Involving
Peter B. WALTON,
Respondent-Attorney.**

No. 6289.

Supreme Court of Alaska.

Sept. 30, 1983.

As Amended Jan. 3, 1984.

Robert H. Wagstaff, Wagstaff, Middleton & Pope, Anchorage, for respondent.

John R. Lohff, Lohff & Van Goor, Anchorage, for Alaska Bar Association.

Before BURKE, C.J., RABINOWITZ, MATTHEWS, and COMPTON, JJ., and CARPENETI,* Superior Court Judge.

## OPINION

PER CURIAM.

This is a disciplinary matter involving attorney Peter B. Walton. Walton allegedly "created" a document, a copy of which he later attached, as an exhibit, to an unverified complaint. This action resulted in the Alaska Bar Association [ABA] initiating disciplinary proceedings against him. The Disciplinary Board[1] of the ABA recommended that Walton be suspended from the practice of law for eighteen months.[2] Walton contends that he has been denied

due process of law and that the evidence does not support a finding of any wrongdoing.

Walton "created" the document while representing the Aleut Corporation in civil litigation against L. William Childs. Childs had been Aleut's chief executive officer from 1972 until mid-1975, when his relationship with the corporation's board of directors and officers deteriorated. When Childs left Aleut, there was disagreement as to Aleut's obligations under its employment contract with Childs. Aleut filed a declaratory judgment action against Childs to resolve the uncertainty.

In early March, 1978, Frank Cowden, Aleut's vice-president and director for litigation, reviewed all of Aleut's outstanding loans. He discovered a March 2, 1973, promissory note, executed by Childs in favor of Aleut for $13,000. The promissory note stated that it was secured by a deed of trust on a specified parcel of real estate. Unable to find a copy of the deed of trust in the corporation's records, Cowden went to the Recorder's Office and obtained a copy of the recorded deed. Although the promissory note referred to a deed of trust, the one found at the Recorder's Office was labelled a *second* deed of trust and contained a subordination clause. The deed of trust was signed by Childs and notarized on March 2, 1973. The subordination clause stated that the deed was subordinate to another deed of trust held by Alaska Mutual Savings Bank, which secured a $47,000 loan to Childs executed on March 5, 1973, and was recorded on March 6, 1973. Thus, on its face, the deed of trust in favor of Aleut appeared to have been altered, by adding the subordination clause after Childs had signed it. In addition, Childs had not recorded the deed until October 6, 1973.

---

* Carpeneti, Superior Court Judge, sitting by assignment made pursuant to Article IV, Section 16, of the Constitution of Alaska.

1. In disciplinary matters, the Board of Governors of the Alaska Bar Association is referred to as the "Disciplinary Board." Rule II–13(a), Alaska Bar R.

2. The Board's findings and recommendations are attached hereto as Appendix "A."

In mid-March 1978, Walton filed a second lawsuit on Aleut's behalf against Childs [Childs II], alleging that the $13,000 loan was illegal. Childs moved to dismiss the complaint. However, so that scheduled depositions could be completed, the parties stipulated that Aleut's opposition to that motion did not have to be filed until April 25, 1978.

Childs' deposition began on April 13, 1978. He testified that the $13,000 loan was made pursuant to an understanding that Aleut would furnish the down payment that Childs needed to purchase a home in Anchorage, in consideration for his moving to Alaska to work for the corporation. He stated that he had signed the promissory note March 2, 1973, and that he had executed and delivered a copy of the deed of trust to Aleut on the same date. He further testified that the deed of trust had not been altered after he signed it. On April 21, 1978, Childs' deposition was resumed. Before any questioning began, Childs stated that he wanted to change his earlier statement that the deed of trust had not been altered. He admitted that it had and that he knew of this prior to having it recorded.

On April 25, 1975, Aleut, through Walton, filed an amended complaint in Childs II alleging that Childs had defrauded the corporation in obtaining the $13,000 loan. Paragraph 4 of that complaint stated:

4. Accordingly, on 2 March, 1973, for the purpose of financing a down payment in connection with the purchase of a home in Anchorage, Alaska, defendants obtained funds from the plaintiff totaling $13,000, repayment of which they professed would be made according to the terms of a Promissory Note attached hereto marked Exhibit A. At the same time, defendants executed a Deed of Trust for the benefit of the plaintiff Corporation and delivered a copy thereof to the president and secretary of the plaintiff corporation. *A copy of that copy is attached hereto marked Exhibit B.*

The original Deed of Trust was either retained by defendant L. William Childs or, at his discretion, was left with a legal secretary named Susan Abbott, then employed by attorneys for the plaintiff Corporation. On its face, the original Deed of Trust (*of which a copy is attached marked Exhibit B*) appeared to be a first Deed of Trust, not secondary to any other lien on the subject property.

Either by express representations or by his silence, defendant L. William Childs represented to plaintiff and/or led the plaintiff to reasonably believe that the said Deed of Trust, *Exhibit B,* was a first Deed of Trust and not subordinate to any other lien on the subject property. In fact, however, defendant did not own the real property in which he purported to grant plaintiff a security interest in the form of a Deed of Trust.

(Emphasis added). In Paragraph 8, the amended complaint alleged that Childs later materially altered the original deed of trust by adding the word "Second" to the top of the document and by adding the subordination clause. The complaint referred to this allegedly altered deed as Exhibit D.

Although the references to Exhibit B in Paragraph 4 suggested that the original deed of trust is a copy (or a copy of a copy) of an existing document signed by Childs,[3] that was not in fact the case. As stated in the opening brief submitted by Walton to this court:

Walton created illustrative Exhibit "B" by making a xerox copy of the deed of trust as altered and recorded by Childs. Using this copy, Walton then blanked out what he believed to be those provisions that had been wrongfully added to the instrument after its execution.

The blanked out parts consisted of: "(1) recording data; (2) the word '*Second*'; (3) the subordination clause; (4) and the re-

---

**3.** Similar references to Exhibit B are also made in paragraphs 5, 8 and 12 in the amended complaint.

cording information on p. 2 (reverse side) of the Deed of trust...." Walton "created" this document on April 14, 1978, the day after Childs stated in his deposition that the deed had not been altered, but before Childs later corrected his earlier statement.

The amended complaint was served on Childs' attorney, Hugh G. Wade, on April 25, 1978. Although Walton believed that filing the amended complaint rendered the motion to dismiss moot, he filed an opposition to the motion in which the deed of trust he "created" was referred to [4] and attached thereto as Exhibit K.

Wade eventually discovered through depositions that Exhibit B was a reconstruction of the deed of trust, and filed a motion for sanction in the superior court. The superior court dismissed the amended complaint in Childs II without prejudice, and referred the matter to the district attorney for possible criminal prosecution under AS 11.30.300 (Preparing False Evidence) [5] and to the ABA for possible disciplinary action.

On August 5, 1980, the State Bar Disciplinary Administrator, pursuant to Bar Rule II-15(e), filed a Petition for Formal Hearing with the Disciplinary Board. That petition alleged that Walton's use of Exhibit B in the amended complaint filed in Childs II violated: (1) DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); (2) DR 1-102(A)(5) (engaging in conduct prejudicial to the administration of justice); (3) DR 7-102(A)(1) (asserting a position that will obviously serve merely to harass or maliciously injure another); (4) DR 7-102(A)(3) (concealing or knowingly failing to disclose that which by law is required to be disclosed); (5) DR 7-102(A)(6) (participating in the creation of evidence that is obviously false); (6) DR 7-106(C)(1) (alluding to a matter that has no reasonable basis of sup-

port in relevant admissible evidence); and (7) Alaska Bar Rule II-9 (obstructing the administration of justice).

On October 7, 1980, Walton filed his Response to Petition for Formal Hearing. Although in effect admitting that he had created Exhibit B, Walton denied that it was ever intended or represented to be "a true and correct copy of an existing document." He further denied that his conduct was unethical or that he had violated any disciplinary rule.

On August 5 and 6, 1981, a hearing was held by a Hearing Committee pursuant to Bar Rule II-15(f). In its Report, the Hearing Committee concluded that Walton had violated DR 1-102(A)(4) (intentional misrepresentation), DR 1-102(A)(5) (engaging in conduct prejudicial to the administration of justice) and DR 7-102(A)(1) (asserting a position where it is obvious that such would serve merely to harass the opposing party). The Committee's recommended discipline was to publicly censure Walton.

After learning of the contents of the Hearing Committee's Report, counsel for Walton and for the ABA agreed not to appeal the findings and recommendations to the Disciplinary Board. They further agreed to waive the submission of briefs and oral argument.

On August 28, 1981, the Disciplinary Board issued its Findings of Fact and Recommendations. The Board's findings differed from those of the Hearing Committee. First, in addition to the violations found by the Hearing Committee, the Board found that Walton violated DR 7-102(A)(3) (concealing or knowingly failing to reveal what Walton was legally required to disclose), DR 7-102(A)(6) (participating in the creating of obviously false evidence), DR 7-106(C)(1) (stating a matter before a tribunal that Walton had no reasonable basis to believe was supported by admissible

---

**4.** *See* Memorandum In Opposition To Defendants' Motion to Dismiss, p. 3, 4, 9. It bears noting that the ABA's Petition For Formal Hearing alleges only that Walton should be disciplined for his conduct in connection with the amended complaint (i.e., Exhibit B), and makes

no mention of the opposition memorandum filed by Walton (i.e., Exhibit K).

**5.** Walton was indicted for violating AS 11.30.-300, but the indictment was subsequently dismissed because of numerous improprieties that occurred during the grand jury proceedings.

evidence) and Bar Rule II–9 (obstructing the administration of justice). Second, the Board recommended suspending Walton from the practice of law for eighteen months and that he reimburse the ABA for reasonable costs and attorney's fees, pursuant to Bar Rule II–15(j).

On September 8, 1981, Walton moved that the board reconsider its findings and recommendations. The motion was denied and the matter is now before this court.

## I. *Due Process Claims*

We have previously stated that when an attorney is "subject to suspension or disbarment, the disciplinary proceedings must conform to the requirements of due process under both the federal and Alaska constitutions." *In re Robson*, 575 P.2d 771, 773–4 (Alaska 1978). Walton contends that he has been denied due process in a number of respects. We will address these assertions individually.

### A. *Commingling of Functions by Rule and Practice*

The due process clauses of both the federal and Alaska constitutions require that a disciplinary hearing be conducted before an impartial tribunal. *McGinnis v. Stevens*, 543 P.2d 1221, 1228 (Alaska 1975). Walton first argues that the Alaska Bar Rules allocate responsibility in disciplinary matters in such a way that there is an impermissible commingling of prosecutorial and adjudicatory functions. Rule II–13(c) provides:

The Board shall have the power and duty:

(1) To appoint a State Bar Disciplinary Administrator (hereinafter referred to as "Administrator").

(2) To supervise the investigation of all complaints against lawyers and to supervise the Administrator and his or her staff.

(3) To retain legal counsel.

(4) To hear appeals from the recommendations of Hearing Committees, and to modify the findings of fact, conclusions of law or proposed orders of Hear-

ing Committees, regardless of whether there has been an appeal to the Board, and without regard to the discipline recommended by the Hearing Committee.

Rule II–14(a) states that the Administrator serves at the pleasure of the Board, and further provides that the Administrator shall:

(7) In his discretion, prosecute complaints and appeals . . . .

. . . .

(10) Keep the Board fully informed about the progress of all matters in his charge.

(11) Perform other duties set forth herein or assigned by the Board.

According to Walton, the above rules make the Board in effect both prosecutor and judge, which, he claims, is unconstitutional.

■■■ Due process requires some separation between those persons prosecuting the complaint and those adjudicating it; the prosecutor, who has a "probable partiality," should not be in a position to influence the decision makers. *In re Robson*, 575 P.2d 771, 774 (Alaska 1978). There may, however, be some combination of these functions within a particular agency. In *In Re Cornelius*, 520 P.2d 76, 83–4 (Alaska 1974), we stated:

There is . . . no merit to the claim that the combination of functions of the state bar attorney, alleged to be that of complainant, prosecutor and adjudicator, violated due process or AS 44.62.630. The combination of investigative and judicial functions within an agency does not violate due process; a board may make preliminary factual inquiry on its own in order to determine if charges should be filed.

Similarly, in *In re Hanson*, 532 P.2d 303, 306 (Alaska 1975), we held that the rules of the Commission on Judicial Qualifications, which allowed the Commission both to conduct a preliminary investigation and to adjudicate facts, did not violate due process. In light of these precedents, we are not persuaded that the allocation of responsibility under the aforementioned sections of

Rule II–13 and Rule II–14 violate due process.

This does not mean that proceedings conducted pursuant to the above Rules are immune from constitutional attack. In *In re Robson*, 575 P.2d 771 (Alaska 1978), we held that the presence of Bar Counsel during the Disciplinary Board's deliberations violated the respondent's due process rights, even though Bar Counsel had not participated in the actual prosecution of the case before the hearing committee, or taken an active part in the Board's deliberations. *Id.* at 773–75.

■ Walton's claim of impropriety in the instant case is directed at the role played by Karen Hunt, the ABA's then President.[6] Bar Rule II–15(a) states that the President shall select members of Hearing Committees, subject to the Board's ratification. In addition, as a member of the Board of Governors, the President is a member of the Disciplinary Board. Bar Rule II–13(a). Hunt, among other things, acknowledged receipt of Walton's Motion for Reconsideration of the Board's findings and recommendations, and denied Walton's Motion for Continuance, an action that was later ratified by the Board. Walton is correct that Hunt's performance of these administrative duties aligned her with the adjudicatory arm of the ABA. The only alleged commingling of roles by Hunt, however, is based on the assertion that she once intended to represent the ABA in the proceedings before this court.

Apparently because it was suggested by Walton that her representation of the ABA might pose a conflict of interest, Hunt never appeared on behalf of the ABA. The ABA was represented before this court by John R. Lohff, a private practitioner acting as Bar Counsel. While it may have been poor judgment for Hunt to have even considered representing the ABA before this court, we do not think that her having done

so was sufficient to taint the proceedings. Her action certainly falls far short of the impropriety that was held to violate due process in *In re Robson*, 575 P.2d at 773–775. Accordingly, Walton's due process argument, based upon commingling of functions, fails.

**B.** *Non-Appearance Before the Board*

■ Walton contends that the Board's departure from the Hearing Committee's findings and recommendations without calling for briefs or oral argument denied him due process. The Bar Rules expressly afforded Walton the right to submit briefs to the Board and to appear before it for oral argument. Bar Rule II–15(i). Walton chose not to, however, and instead, with counsel for the ABA, waived appeal to the Board as well as oral argument and submission of briefs. Bar Rule II–13(c)(4) confers upon the Board the power and duty

> to modify the findings of fact, conclusions of law or proposed orders of Hearing Committees, regardless of whether there was an appeal to the Board, and without regard to the discipline recommended by the Hearing Committee.

We believe that the Rules clearly afforded Walton an opportunity to be heard by the Board. Furthermore, since Walton was on notice that the Board might depart from the Hearing Committee's findings and recommendations, whether or not there was an appeal, Walton waived his right to be heard, by entering into the stipulation.

**C.** *Membership of Board*

Before these disciplinary proceedings were initiated, the district attorney sought an indictment against Walton for the same conduct at issue here. The indictment was dismissed because of improprieties occurring before the grand jury. No further indictment was sought. At the time the

---

**6.** Walton briefly indicates that there is an "internal record memoranda file" available to the attorney prosecuting the disciplinary matter, the Bar Association and the Board, but not available to him. Walton's request for access to the file was denied apparently on the grounds that it

was privileged work product and because the Bar Rules do not provide for such disclosure. Since the record fails to demonstrate that any member of the Board had access to the file, we elect not to consider this issue.

District Attorney's Office was prosecuting Walton, Elizabeth Kennedy, one of the members of the Disciplinary Board, was employed by the Department of Law in the civil section of the Attorney General's Office. Walton claims that the Disciplinary Board was, therefore, improperly constituted.

■ In support of his argument, Walton cites Canon 3 C(1)(b) of the Code of Judicial Conduct, which states that a judge should recuse himself when "a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter." However, even if the Code of Judicial Conduct applies to members of the Disciplinary Board, we do not believe that the entire Department of Law should be considered one law office, or that all attorneys employed thereby should be considered to be practicing law together for purposes of Canon 3 C(1)(b). Although within the same department, the Attorney General's Office and the District Attorney's Office operate separately, and there is no indication that Kennedy had any part in the prosecution of Walton. Thus, the Disciplinary Board was not improperly constituted. *Cf. Keel v. State,* 552 P.2d 155 (Alaska 1976) (former assistant district attorney not disqualified from acting as judge in a criminal action).

### D. *Standard of Proof*

According to Walton, the required standard of proof in this case is proof by "clear and convincing evidence." Proof by a mere preponderance, he argues, amounts to a denial of due process of law.

■ Alaska Bar Rule II–15(f) provides, partly: "The Administrator shall have the burden ... of demonstrating by the preponderance of the evidence that the Re-

spondent has, by act, or omission, committed an offense...." The use of this standard in bar disciplinary matters was approved by this court in *In re Robson,* 575 P.2d 771, 776–77 (Alaska 1978). Although the respondent in *Robson,* unlike Walton, did not argue that use of the preponderance standard violated his right to due process, Walton's argument in the present case fails to persuade us that he is entitled to be judged by a different standard.

Only one of the cases cited by Walton for the proposition that due process requires proof by clear and convincing evidence before an attorney may be disciplined actually concerned attorney discipline,[7] and that case did not even address the standard of proof issue, much less require proof by clear and convincing evidence.[8] A review of the leading cases and consideration of the important policy issues involved here leave us convinced that requiring proof by a preponderance of the evidence—rather than a higher standard—does not violate Walton's due process rights.

*Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), provides the analytical framework for the burden of proof issue. In *Santosky,* which concerned termination of parental rights, the Court held that the proper standard of proof could be determined by the "balancing process," 455 U.S. at 754, 102 S.Ct. at 1394, 71 L.Ed.2d at 607, established in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). In that process the court must weigh the private interest involved in any given proceeding against the public's interest, and determine whether, given the relative strengths of those interests, the risk of error of an incorrect factual decision should be evenly borne or should be placed more heavily upon the public. If, because the individu-

---

7. Walton relies principally on *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); and *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Santosky* concerned termination of parental rights. *Addington* involved a civil mental commitment. *Mathews* dealt with termination of disability benefits under the So-

cial Security Act. For the reasons discussed below, these cases do no persuade us that due process requires proof by clear and convincing evidence in attorney discipline cases.

8. *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 17 (1968).

al's interest is greater than the public's, the risk should be placed more heavily upon the public, then a higher standard of proof must be used.

The private interest in the present case is Walton's interest in practicing law, which is his livelihood, and his interest in protecting the integrity of his name. These are weighty interests indeed. The public interest in the present case is the public's interest in a fair and accurate judicial system, which requires that lawyers working within it act with integrity and honesty. This interest, like Walton's, is a substantial one.

This court cannot conclude, as Walton asks us to do, that his interest in practicing law and in his reputation is so much more substantial than the public's interest in a fairly and accurately functioning judicial system that we should adopt a standard of proof which puts the risk of an incorrect factual determination on the public. Lawyers are licensed by the state (through this court) to engage in activities affecting the public from which others are excluded. Their licensing includes a certification of fitness to hold the trust and confidence of the public at large, including potential clients as well as potential adversaries. The harm which would be caused by a lawyer acting unethically is substantial. Under all of these circumstances, we are unwilling to hold that the risk of an incorrect factual determination in a bar disciplinary proceeding should be placed primarily on the public. Because there are substantial interest on both sides, the risk of error [9] should be borne equally. That is ac-

complished by use of the preponderance of the evidence standard. Due process demands no more.

Thus, we reject Walton's position that proof by clear and convincing evidence is required as a matter of federal due process.[10] Nor does the authority that he cites persuade us that such is required under the state constitution.[11]

## II. *Fabrication of False Evidence*

Walton contends that, as a matter of law, he did not create false evidence in violation of DR 7–102(A)(6), since, according to Walton, an unverified complaint is not evidence. The Bar Association contends that the term "evidence," in this context, should not be limited to its technical meaning under the Rules of Evidence. According to the ABA, DR 7–102(A)(6) should apply to any false document concerning a critical aspect of an ongoing lawsuit, produced by manipulations outside the courtroom.

Like the ABA, we believe that the term "evidence," in this context, was meant to apply to a broader category of items than those admissible at trial under the technical requirements of the Rules of Evidence. Documents attached to pleadings, although not always admissible evidence, are often relied upon by the court and counsel in matters of importance. Opposing counsel, for example, upon seeing a document such as the one in the case at bar, might well conclude that his client's position was untenable and so advise him, despite the fact that the document was

**9.** The risk of error, in any event, should be low. There are extensive procedural protections which surround bar disciplinary proceedings. *See, e.g.,* Alaska Bar Rules II–15(f), (h), (i), (j), and II–22.

**10.** Walton's argument fails to make clear whether he relies upon the due process guaranteed by the Alaska Constitution or that contained in the Constitution of the United States. The two guarantees are not necessarily the same. *South Dakota v. Neville,* —— U.S. ——, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983).

**11.** *In re Hanson,* 532 P.2d 303, 308 (Alaska 1975), held that proof by clear and convincing evidence is required in disciplinary proceedings

against a judge, for alleged violations of the Code of Judicial Conduct. Today's decision affirms a lesser standard of proof in attorney discipline cases. *Hanson,* however, was not based on due process grounds. Also, in *Hanson* the applicable statutes and rules contained *no* prescribed standard. *Id.* at 307. Here, there is a prescribed standard: proof by a preponderance of the evidence. Rule II–15(f), Alaska Bar R.

In light of today's ruling, we may be required to reevaluate our holding in *Hanson* if and when we are presented with another case involving disciplinary proceedings against a judge.

fabricated. The danger is that others will be misled, to their detriment, with a potential for harm as great as if the item had been admissible at trial.

### III. *Evidence of Wrongdoing*

■ Where, as here, findings of fact entered by the Disciplinary Board are challenged in this court, "the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous." *In re Simpson*, 645 P.2d 1223, 1227 (Alaska 1982). And,

> [t]hough this court has the authority, if not the obligation, to independently review the entire record in disciplinary proceedings, findings of fact made by the Board are nonetheless entitled to great weight. The deference owed to such findings derives from the responsibility to conduct disciplinary proceedings which this court has delegated to the Bar Association.

*Id.* at 1226–1227.

■ Upon review of the entire record, we conclude that the findings of the Board, in all material respects, are supported by the evidence. The findings and recommendations of the Board are AFFIRMED. Respondent Peter B. Walton is ordered suspended from the practice of law for a period of eighteen months, effective 30 days after the publication date of our opinion. Respondent is ordered to comply with the requirements of Rule II–26, Alaska Bar Rules.

MOORE, J., not participating.

### APPENDIX A

### BEFORE THE DISCIPLINARY BOARD

### ALASKA BAR ASSOCIATION

| | |
|---|---|
| In the Disciplinary Matter Involving: | ) ) ) ) |
| PETER B. WALTON, | ) ) |
| Respondent-Attorney. | ) ) ) ) |

No. 78–13

### FINDINGS OF FACT AND RECOMMENDATIONS OF THE DISCIPLINARY BOARD OF THE ALASKA BAR ASSOCIATION

Based on the evidence received the Board makes the following findings:

1. Respondent PETER B. WALTON is, and at all times relevant to this proceeding has been, an attorney at law admitted to practice in the State of Alaska and a member of the Alaska Bar Association.

2. During an extended period, which included the period of April and May of 1978, the Respondent represented the Aleut Corporation in litigation against L. William Childs and Patricia A. Childs.

3. On April 14 and April 15 of 1978, in the manner described more fully below, the Respondent prepared a document which appeared to be a photocopy of a Deed of Trust executed on March 2, 1973, by L. William Childs and Patricia A. Childs as Trustors to Alaska Title Guaranty Company as Trustee for the benefit of the Aleut Corporation.

4. The document referenced in Finding 3 above was prepared by utilizing a photocopy of a Second Deed of Trust of the same date from which the Respondent deleted, by means of "white-out" or some other white obliterating liquid, the word "Second" from above the caption "Deed of Trust," a subordination provision reflecting that the Deed of Trust was second and subordinated to a Deed of Trust executed for the benefit of Alaska Mutual Savings Bank and all recording data, including graphite marks utilized by the recording office to highlight the seal of the notary public.

5. Preparation of the document reflected extreme care in the utilization of the whiting material, particularly in the vicinity of the notary seal, and in photocopying so that the alterations were not detectable.

6. Respondent attached the fabricated document which appeared to be photocopy of an actual First Deed of Trust as Exhibit

B to an "Amended Complaint" and as Exhibit K to a "Memorandum in Opposition of Defendant's Motion to Dismiss or Motion for Summary Judgment" prepared in conjunction with services rendered by the Respondent in the *Aleut Corporation v. Childs* cases.

7. In the text of the Amended Complaint, the document prepared by the Respondent and attached as Exhibit B was described first as a "copy of that copy" of the Deed of Trust which had been executed and delivered to the Aleut Corporation. The document was then described as "a copy" of "the original Deed of Trust." Exhibit B was referenced numerous times in the Amended Complaint and none of the references was made with ambiguous language that could be construed to advise that the exhibit was a document created for illustrative purposes.

8. The memorandum to which the fabricated document was attached as Exhibit K referred to that exhibit three times, none of which references was in an ambiguous form that might be construed to advise that the document was recreated for illustrative purposes.[1]

9. Following preparation of the fabricated Deed of Trust and its attachment to the referenced pleadings, those pleadings were reviewed by Lee Holen, a law clerk performing services in the Respondent's offices on a contract basis, and after such review Ms. Holen expressed her concern to the Respondent that his description of the document might be misunderstood. That expression of concern was "brushed off" by the Respondent.

10. On April 25, 1978, copies of the pleadings to which the fabricated Deed of Trust was attached were served upon Hugh Gerald Wade, attorney for L. William Childs, after hours by taxi at his home. The original pleadings were not filed with the court until May 4, 1978.

11. During the deposition of Frank Cowden, Vice-President for the Aleut Corporation, on May 5, 1978, Cowden was asked by Child's attorney on direct examination if he had brought with him any document in compliance with a subpoena. Cowden produced the fabricated Deed of Trust with a communication from Respondent attached to it. This memorandum, prepared April 14, 1978, was produced with an express waiver of the attorney-client privilege, despite opposing Counsel's statement that it need not be produced. It read:

> Dear Frank: Guess what? Here's the smoking gun. Either Childs falsely testified when he said he gave Lily a copy of his deed of trust on March 2nd, or he falsely testified when he said it hadn't been altered after executed it [sic]. But in that case he will have difficulty explaining why he concealed the fact of its alteration. Cheers, Peter Walton.

Nowhere in the memorandum does Respondent refer to the document as a fabrication.

12. During the deposition of Frank Cowden, Vice President for the Aleut Corporation, on May 5, 1978, following evasive testimony on direct examination which made it appear that the fabricated Deed of Trust attached as a copy of the pleadings was or may have been a copy of an actual Deed of Trust in the possession of the Aleut Corporation or the Respondent, the Respondent, through leading questions on cross-examination, elicited testimony to establish that the Deed of Trust attached as Exhibit B to the Amended Complaint and as Exhibit K to the memorandum was fabricated by the Respondent. At no time prior to this cross-examination did Respondent reveal by any oral or written communication that the "copy" of the Deed of Trust attached as an exhibit to various

---

1. The Area Hearing Committee determined as follows:
   The Petition did not assert that the Respondent committed misconduct arising from submission of Exhibit K to the motion and the Area Hearing Committee took no action in that regard. The Committee determined, nevertheless, that utilization of the re-created document in conjunction with the Memorandum in Opposition to the Motion to Dismiss is properly considered as bearing upon the Respondent's intent.
   The Board concurs with this determination.

pleadings filed with the Court and delivered to opposing Counsel was, in fact, a fabricated document.

13. Respondent intended that the fabricated document attached to the Amended Complaint as Exhibit B would be understood to be a copy of an existing photocopy of an actual Deed of Trust. This finding is based upon the care exercised by Respondent in the preparation· of the fabricated Deed of Trust, the precise nature of the references in the pleadings referring to the exhibit, the repeated references in the Amended Complaint and the Memorandum in Opposition to the Motion to Dismiss, Respondent's decision to ignore the warnings of a colleague regarding the possible misinterpretation of the references ·to the document, the text of the "smoking gun" memorandum, Respondent's failure to notify opposing counsel or the court that the document was a fabrication, the findings set forth above and the record herein.

14. The document attached as Exhibit B to the Amended Complaint and Exhibit K to the Memorandum in Opposition to a Motion to Dismiss was not in the nature of an illustrative exhibit designed to demonstrate to the court or opposing counsel the Respondent's interpretation of the evidence or a theory of Respondent's that was supportable by evidence.

Based on the above findings the Board recommends the following

## CONCLUSIONS

1. Respondent violated Disciplinary Rule 1–102(A)(4) of the Code of Professional Responsibility by engaging in conduct involving intentional misrepresentation in that he intentionally misrepresented in pleadings served on opposing counsel and filed with the court that a document attached as an exhibit was a copy of an actual Deed of Trust when in fact it was fabricated by the Respondent.

2. Respondent violated Disciplinary Rule 1–102(A)(5) of the Code of Professional Responsibility by engaging in conduct prejudicial to the administration of justice.

3. Respondent violated Disciplinary Rule 7–102(A)(1) of the Code of Professional Responsibility by asserting a position (i.e., that a copy of an existing copy of an actual Deed of Trust was attached as an exhibit), when it was obvious that such action would serve merely to harass the opposing party.

4. Respondent violated Disciplinary Rule 7–102(A)(3) of the Code of Professional Responsibility by concealing or knowingly failing to disclose that which he is required by law to reveal.

5. Respondent violated Disciplinary Rule 7–102(A)(6) of the Code of Professional Responsibility by participating in the creation of evidence when it was obvious that the evidence was false.[2]

6. Respondent violated Disciplinary Rule 7–106(C)(1) of the Code of Professional Responsibility by stating a matter before a tribunal that he had no reasonable basis to believe was supported by admissible evidence.[3]

7. Respondent violated Alaska Bar Rule II–9.

## RECOMMENDED DISCIPLINE

It is the recommendation of the Disciplinary Board that Respondent be suspended from the practice of law pursuant to Alaska Bar Rule II–12(b) for a period of eighteen months. The recommendation of the Board is based upon the serious nature of Respondent's misconduct and not upon the number of disciplinary rules his conduct violated. It is the further recommendation of the Board that the Court order that Respondent reimburse the Association for reasonable costs and attorney fees incurred

---

**2.** The Board does not consider the actual submission or admissibility of evidence as determinative of this issue. For example, a violation would occur if a lawyer impressed a murder victim's fingerprints on a gun, left the gun at the murder scene, departed and thereafter took no active role.

**3.** The Board concludes that an appearance before a tribunal may be in written as well as verbal form.

herein pursuant to Bar Rule II–15(j) based upon the statement of costs and attorney fees submitted herewith.

RESPECTFULLY SUBMITTED by the Disciplinary Board of the Alaska Bar Association this 28th day of August, 1981.

/s/ A.J. Kleinfeld
Andrew J. Kleinfeld
Chairman

/s/ Richard D. Savell
Richard D. Savell
Recorder

/s/ Harold M. Brown
Harold M. Brown

/s/ Mary K. Hughes
Mary K. Hughes

/s/ Elizabeth Page Kennedy
Elizabeth Page Kennedy

/s/ William B. Rozell
William B. Rozell

RABINOWITZ, Justice, joined by MATTHEWS, Justice, dissenting.

I dissent from the majority's rejection of Walton's due process claim as it relates to the applicable burden of proof in bar disciplinary matters. I further dissent from the majority's affirmance of the Disciplinary Board's findings of fact regarding Walton's alleged violation of the various Disciplinary Rules involved in this proceeding. Employing a clear and convincing burden of proof, my review of the record persuades me that the Bar has only demonstrated that Walton's conduct was both negligent and grossly negligent, thus violative of DR 1–102(A)(5) and (6). I would therefore impose the sanction of a public censure.

I. *Whether the "Preponderance of the Evidence" standard is violative of due process under the Alaska Constitution.*

Walton's position is that the use of a preponderance of the evidence standard

called for by Alaska Bar Rule II–15 violates due process under Alaska's Constitution in disciplinary proceedings, particularly in those proceedings in which fraudulent conduct is charged. In my view, the United States Supreme Court's decision in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) furnishes persuasive support for Walton's position. In *Santosky*, the Court was called upon to determine whether the "preponderance of the evidence" or "clear and convincing" standard should be applied in parental rights termination proceedings. Applying the three factors enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976), which govern a determination of what process is due under the Fourteenth Amendment in any given fact situation,[1] the *Santosky* court concluded that the first factor, the importance of the individual interests at stake, dictated that a clear and convincing standard be applied:

This Court has mandated an intermediate standard of proof—"clear and convincing evidence"—when the individual interests at stake in a state proceeding are both "particularly important" and "more substantial than mere loss of money." *Addington v. Texas*, 441 U.S. [418] at 424, 60 L.Ed.2d 323, 99 S.Ct. 1804 [at 1808]. Notwithstanding "the state's 'civil labels and good intentions,'" *id.*, at 427, 60 L.Ed.2d 323, 99 S.Ct. 1804 [at 1810], quoting *In re Winship*, 397 U.S. [358] at 365–366, 25 L.Ed.2d 368, 90 S.Ct. 1068 [at 1073], 51 Ohio Ops.2d 323, the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with "a significant deprivation of liberty" or "stigma." 441 U.S. [418]

---

1. The *Eldridge* court observed:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33.

at 425, 426, 60 L.Ed.2d 323, 99 S.Ct. 1804 [at 1809]. *See, e.g., Addington v. Texas, supra,* (civil commitment); *Woodby v. INS,* 385 U.S. [276] at 285, 17 L.Ed.2d 362, 87 S.Ct. 483 [at 487] (deportation); *Chaunt v. United States,* 364 U.S. 350, 353, 5 L.Ed.2d 120, 81 S.Ct. 147 [149] (1960) (denaturalization); *Schneiderman v. United States,* 320 U.S. 118, 125, 159, 87 L.Ed. 1796, 63 S.Ct. 1333 [1336] (1943) (denaturalization).

455 U.S. 745, 753–57, 102 S.Ct. 1388, 1394–96, 71 L.Ed.2d 599 at 608–09. I think it apparent that the individual interests at stake in a bar disciplinary proceeding are "particularly important and more substantial that the mere loss of money" to the attorney involved. The proceedings stigmatize the attorney and threaten him with a significant deprivation of liberty.

The second *Eldridge* factor, whether the Bar Rule's chosen standard creates a risk of error, again weighs in favor of adopting the clear and convincing evidence standard. This is evidenced by the facts of the instant case. If Walton is indeed innocent of the allegations made against him, the risk of wrongful discipline would be significantly reduced by using the clear and convincing evidence standard.

Concerning the third *Eldridge* factor, it is clear that the state has an interest in protecting society from attorneys who have violated bar disciplinary rules.[2] The Supreme Court has characterized the preponderance of the evidence standard as placing the risk of error equally upon the parties. When adopting the clear and convincing evidence standard in *Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1978), the Supreme Court stated "[t]he individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." The dispositive inquiry thus becomes whether the potential injury to the attorney from an incorrect determination of a violation of the disciplinary rules is "significantly greater" than the possible harm to the state caused by: (1) an incorrect determination that an attorney has not violated the rules, and (2) the increased burden on the state of meeting the higher standard of proof. In my view, the potential injury to the attorney is significantly greater, and therefore I would hold that due process under Alaska's Constitution requires the use of the clear and convincing standard rather than the preponderance of the evidence standard.[3]

2. A principal purpose of attorney disciplinary proceedings is protection of the public and maintenance of the integrity of the judicial system. *See, In re Kleindeinst,* 132 Ariz. 95, 644 P.2d 249, 256 (1982) (en banc) ("[d]iscipline against an attorney has two purposes: (1) to protect the public from unethical attorneys; and (2) to deter other attorneys from engaging in unethical conduct"); *District of Columbia Bar v. Kleindeinst,* 345 A.2d 146, 148 (D.C.App.1975) (per curiam) (a purpose of disciplinary action is partly to maintain integrity of profession in eyes of public); *State v. Scott,* 230 Kan. 564, 639 P.2d 1131, 1134 (1982) (per curiam) ("disciplinary proceedings ... are a species unto themselves which cannot be characterized as either a civil action or a criminal proceeding .... Although the errant attorney may receive punishment, the purpose of these proceedings is primarily for the protection of the courts, the legal profession, and the general public from those who have been lacking in professional responsibility.").

3. Thirty-one states and the District of Columbia use the clear and convincing standard. *See,* for example:

Alabama *Hunt v. Disciplinary Board of Alabama State Bar,* 381 So.2d 52 (Ala.1980).

Arizona *Matter of Rubi,* 133 Ariz. 491, 652 P.2d 1014 (1982).

California *Price v. State Bar of California,* 30 Cal.3d 537, 179 Cal.Rptr. 914, 638 P.2d 1311 (1982) ("convincing proof to a reasonable certainty").

Colorado *People v. Howard,* 147 Colo. 501, 364 P.2d 380 (1961) ("substantial, clear, convincing and satisfactory").

Delaware *In re Morford,* 46 Del. 144, 80 A.2d 429 (1951).

D.C. *Matter of Thorup,* 432 A.2d 1221 (D.C. 1981).

Florida *The Florida Bar v. Ragano,* 403 So.2d 401 (Fla.1981).

Hawaii *Disciplinary Board of Hawaii Supreme Court v. Kim,* 59 Hawaii 449, 583 P.2d 333 (1978) ("and beyond reasonable doubt").

Illinois *In re Jafree,* 93 Ill.2d 450, 67 Ill.Dec. 104, 444 N.E.2d 143 (1982).

Iowa *Committee on Professional Ethics and Conduct of Iowa State Bar Association v. Thompson,* 328 N.W.2d 520 (Iowa 1983) ("convincing preponderance").

## II. *Evidence of wrongdoing.*

Review of the Disciplinary Board's findings, pursuant to the standards articulated in *In re Simpson*, 645 P.2d 1223, 1227 (Alaska 1982), has convinced me that Walton did not intend to deceive. On the other hand, I conclude that the evidence in the record clearly and convincingly demonstrates that Walton's conduct was both negligent and grossly negligent. . He should have known that the language used in the amended complaint—"a copy of a copy"—would be taken to mean a photocopy. He thus violated DR 1–102(A)(5) and (6).[4]

Given my conclusion that Walton did not intend that the fabricated document would be taken to be a photocopy of an existing document, it follows that Walton did not violate DR 1–102(A)(4) (intentional misrepresentation); DR 1–102(A)(1) (asserting a position merely to harass); DR 7–102(A)(3) (concealing or knowingly failing to disclose that which should be revealed); or DR 7–102(A)(6) (creation of false evidence). In addition, I think the record demonstrates that Walton did believe he could prove that an alteration along the lines of the exhibit he prepared had been accomplished by Childs.

My reasons for the foregoing conclusions are the following:

1. Walton did not use the fabricated document in the deposition of Childs even though it was in existence at that time. If he had had any intent of using the document as evidence it would seem that he would have confronted Childs with it.

2. It is difficult to understand what Walton had to gain by foisting the fabricated copy off as an actual photocopy. It is undisputed that the document Childs recorded was materially different than the

Kansas *State v. Scott*, 230 Kan. 564, 639 P.2d 1131 (1982) ("substantial, clear, convincing and satisfactory").

Louisiana *Louisiana State Bar Association v. Mitchell*, 375 So.2d 1350 (La.1979).

Maine National Center for Professional Responsibility, State Disciplinary Enforcement Systems Structural Survey 61 (1980).

Maryland *Attorney Grievance Commission of Maryland v. Kerpelman*, 292 Md. 228, 438 A.2d 501 (1981).

Minnesota *In re Gillard*, 271 N.W.2d 785 (Minn.1978).

Mississippi *Netterville v. Mississippi State Bar*, 397 So.2d 878 (Miss.1981).

Montana *Matter of Goldman*, 179 Mont. 526, 588 P.2d 964 (1978) (attorney has burden "to show that charges are not sustained by convincing proof and to a reasonable certainty").

Nevada *Copren v. State Bar*, 64 Nev. 364, 183 P.2d 833 (1947).

New Hampshire *Edes' Case*, 118 N.H. 815, 395 A.2d 498 (1978).

New Jersey *In re Sears*, 71 N.J. 175, 364 A.2d 777 (1976).

New Mexico *In re Sedillo*, 84 N.M. 10, 498 P.2d 1353 (1972).

N. Carolina *Matter of Palmer*, 296 N.C. 638, 252 S.E.2d 784 (1979).

North Dakota *Matter of Lovell*, 292 N.W.2d 76 (N.D.1980).

Oregon *In re Conduct of Paauwe*, 294 Or. 171, 654 P.2d 1117 (1982).

Rhode Island *Carter v. Walsh*, 406 A.2d 263 (R.I.1979).

S. Carolina *In re Friday*, 263 S.C. 156, 208 S.E.2d 535 (1974).

South Dakota *In re Goodrich*, 78 S.D. 8, 98 N.W.2d 125 (1959).

Utah *In re McCullough*, 97 Utah 533, 95 P.2d 13 (1939) ("convincing proof and fair preponderance").

Virginia *Tenth District Committee of Virginia State Bar v. Baum*, 213 Va. 523, 193 S.E.2d 698 (1973).

W. Virginia *Committee on Legal Ethics of West Virginia State Bar v. Pence*, 240 S.E.2d 668 (W.Va.1977) ("full, clear, and preponderating evidence").

Wisconsin *Matter of Sedor*, 73 Wis.2d 629, 245 N.W.2d 895 (1976).

Wyoming *State Board of Law Examiners v. Goppert*, 66 Wyo. 117, 205 P.2d 124 (1949). *See also* the Model Rules for Lawyer Disciplinary Enforcement, ABA Standing Committee on Professional Discipline and the National Center for Professional Responsibility (1979). Rule 17C of these model rules provides as follows: *Standard of Proof.* Formal charges of misconduct, petitions for reinstatement, and petitions for transfer to and from disability inactive status shall be established by clear and convincing evidence.

**4.** DR 1–102(A)(5) and (6) read as follows:

*Misconduct*

(A) A lawyer shall not:

. . . .

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

document Childs signed. That is all that the fabricated document, if it were taken to be real, would demonstrate.

3. There was little chance of any deception succeeding. Walton did not surreptitiously fabricate the document but did so in the presence of Cowden and of Lee Holen, a contract law clerk. The record is not clear on whether other people were present, but is clear that opposing counsel, Wade, had heard that Walton had been using some white-out and a xerox machine in connection with the case, before Wade even received the fabricated document.

4. When ambiguous responses were given by Cowden at his deposition (which was taken only one day after the fabricated document had been filed with the court) Walton promptly elicited the truth of the matter on cross examination.[5]

5. The care exercised by Walton in preparing the exhibit says as much about Walton's compulsive nature as about any intent to deceive.

6. Walton's "decision to ignore the warnings of a colleague regarding the possible misinterpretation of the reference to the document" is again equally consistent with innocence as with guilt.

7. The "smoking gun" memorandum was a memo from Walton to Cowden to which the exhibit was attached. It stated, "Dear Frank: Guess what? Here's the smoking gun. Either Childs falsely testified when he said he gave Lily a copy of his deed of trust on March 2nd, or he falsely testified when he said it hadn't been altered after [executing] it. But in that case he will have difficulty explaining why he concealed the fact of its alteration. Cheers, Peter Walton." The memo was not a communication to the court or opposing counsel. It was a communication to a client that could be clarified subsequently. It does not constitute evidence of any intent to mislead the court or opposing counsel.

8. The fabricated document was attached to the complaint and to a memorandum in opposition to a motion to dismiss which was filed on the same day as the complaint. It appears that the motion to dismiss was of no particular consequence and that Walton was told by Wade before

---

5. Further, at the evidentiary hearing counsel for the Bar Association, while clearly leaving room for the local disciplinary board to find intentional conduct, suggested that what was involved was unintentional conduct: "Now I would suggest that the conduct of Mr. Walton was misrepresentation. Perhaps at the most generous an accidental misrepresentation, but it still amounted to a misrepresentation to the court." [Tr. 220] "Now whether there was a specific intent to deceive the bar association doesn't intend to say yes, there was a specific intent to deceive, though some of the allegations in the petition might be read to say that." [Tr. 222] ... "Now clearly as is reported and is responded to by the second trial brief from Mr. Boyko on behalf of Mr. Walton, the case of *State v. Nicklaus* is a far more serious case of misstatements to a court system but the principle still applies and is still approved by this court. The serious misleading in pleadings is disciplinary—is a basis for discipline—disciplinary matter and something for which the bar association has brought Mr. Walton to this proceeding and something for which I suggest that you should find is a basis for discipline of Mr. Walton. There is a spectrum of appropriate penalties based on the indication of intent to deceive in the case law. Clearly in the cases where there is a strong indication of an intent to deceive and a continuing pattern of deception both before a court and the hearing committee following it, it is a far stronger basis for suspension and disbarment. The evidence is not here clear that there is an intentional deception on the part of Mr. Walton, except that he intentionally included this document in his pleadings and intentionally used the language that he did. As to whether he intended to deceive the court there's very little evidence of that except that again he intentionally included it in the pleadings which were filed with the court. Obviously when faced with it or when the question about these documents became apparent, he took steps to clear up the matter, and whatever you believe about his other actions, this certainly should be considered in his behalf. But he placed in the court basket downstairs two pleadings which referred to 2—2 times to the same exhibit, and actually many more times but added the same exhibit twice. And that exhibit was a copy of a copy or an exhibit for which he talked about, which was not anything but what he'd built together out of his belief from Mr. Childs' testimony but it's something he *added*, pled and deceived if only by actual use of inept language, of mistaken language, of poor judgment language, but it amounted to deception and interference with justice and a basis for discipline. Thank you."

the opposition was filed that Wade was going to withdraw the motion to dismiss.[6]

### III. *Sanction.*

Given my conclusion that the evidence clearly and convincingly shows that Walton violated DR 1–102(A)(5) (conduct prejudicial to the administration of justice) and DR 1–102(A)(6) (conduct that adversely reflects on his fitness to practice law), I would issue a public censure.

**6.** The foregoing paragraphs numbered 6 through 8 are in reference to the Disciplinary Board's findings of fact that:

Respondent intended that the fabricated document attached to the Amended Complaint as Exhibit B would be understood to be a copy of an existing photocopy of an actual Deed of Trust. This finding is based upon the care exercised by Respondent in the preparation of the fabricated Deed of Trust, the precise nature of the references in the pleadings referring to the exhibit, the repeated references in the Amended Complaint and the Memorandum in Opposition to the Motion to Dismiss, Respondent's decision to ignore the warnings of a colleague regarding the possible misinterpretation of the references to the document, the text of "smoking gun" memorandum, Respondent's failure to notify opposing counsel or the court that the document was a fabrication, the findings set forth above and the record herein.